UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Alston, Chafin and Senior Judge Annunziata
Argued at Alexandria, Virginia

ALICE JIN-YUE GUAN

MEMORANDUM OPINION* BY
v.      Record No. 0968-16-4                JUDGE TERESA M. CHAFIN
FEBRUARY 7, 2017

BING RAN

FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
James C. Clark, Judge

Norman A. Thomas (Norman A. Thomas, PLLC, on briefs), for
appellant.

Christopher W. Schinstock (Christopher W. Schinstock, PLLC, on
brief), for appellee.

In this domestic relations case, Alice Jin-Yue Guan and Bing Ran appeal an order entered

by the Circuit Court of the City of Alexandria on May 13, 2016. Guan challenges the circuit

court's decision in three assignments of error. Specifically, she contends that the circuit court

erred by: (1) failing to order Ran to pay $250,000 in delinquent spousal support, (2) finding that

she breached the parties' October 15, 2008 post-divorce agreement, and (3) refusing to award her

attorney's fees and costs as the prevailing party in the litigation.

Ran challenges the circuit court's decision in three cross-assignments of error. He

contends that the circuit court erred by: (1) ordering him to pay $50,000 in spousal support

contrary to the express wording of the parties' October 15, 2008 post-divorce agreement,

(2) refusing to award him attorney's fees and costs as the prevailing party in the litigation, and

(3) "finding and ruling that the alleged overpayments . . . of $2,462,083.00 taken by [Guan]

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

constituted her separate property and [were] not offset against amounts subsequently accruing to her under the [agreements of the parties]."

For the reasons that follow, we conclude that the parties' October 15, 2008 post-divorce agreement did not effectively waive or modify the circuit court's prior spousal support award. Subsequently, we conclude that Guan did not breach the October 15, 2008 agreement by petitioning the circuit court to collect the $250,000 spousal support award at issue. Additionally, we conclude that the terms of the October 15, 2008 agreement did not entitle Ran to an offsetting distribution of $2,462,083 based on the payments that Guan received from the parties' business in 2008. In light of these decisions, we conclude that it will be necessary for the circuit court to reconsider its decision pertaining to the award of attorney's fees and costs pursuant to the agreement originally incorporated into the parties' final decree of divorce. Accordingly, we affirm the circuit court's decision in part, reverse its decision in part, and remand this case for further consideration.

## I. BACKGROUND

As the parties are fully conversant with the record in this case and this memorandum opinion carries no precedential value, we recite only those facts and incidents of the proceedings as are necessary to the parties' understanding of the disposition of this appeal. Under settled principles of appellate review, we view the evidence in the light most favorable to the prevailing party in the circuit court, and we grant that party the benefit of any reasonable inferences flowing from the evidence presented. Congdon v. Congdon, 40 Va. App. 255, 258, 578 S.E.2d 833, 835 (2003). Thus, in the context of this appeal, we view the evidence pertaining to the issues raised in Guan's assignments of error in the light most favorable to Ran and the evidence pertaining to the issues raised in Ran's assignments of error in the light most favorable to Guan. So viewed, the evidence is as follows.

Guan and Ran married in China in 1985. In that same year, they migrated to the United States and pursued educational opportunities.[1] In 1996, the parties founded Advanced Systems Technology and Management, Inc. ("AdSTM"), a science and technology consulting firm that developed advanced applications for computer modelling and simulation. Although Ran managed many aspects of the business, Guan was the sole shareholder of AdSTM.

As Guan was classified as an individual with a "social disadvantage" because she was an Asian-Pacific American, AdSTM was eligible to enroll in the Small Business Administration's Section 8(a) program. This program provided AdSTM with an advantageous position when bidding for federal contracts. Over time, AdSTM grew into a very successful business that earned millions of dollars each year.

When Guan and Ran separated in 2006, they began arguing about their respective roles in AdSTM. They disagreed about their respective stock ownership percentages in the company, and their rights to manage the company and control its finances. In order to resolve these disputes, the parties entered into a series of agreements addressing their rights concerning AdSTM and other issues.[2]

On December 15, 2006, the parties executed an agreement entitled "Parenting, Support and Property Settlement Final Agreement" ("PSA"). The parties' PSA addressed issues related to their children, their rights to spousal support, and their marital property and interests in

---

[1] Guan earned a Ph.D. in nuclear engineering in 1997, and Ran earned a Ph.D. in mechanical engineering in 1992.

[2] Although the parties entered into numerous agreements, only the "Parenting, Support and Property Settlement Final Agreement" executed on December 15, 2006, and the amendment to that agreement executed on October 15, 2008, are pertinent to this appeal. Additionally, we note that, while the December 15, 2006 agreement was drafted with the assistance of a mediator, the other agreements were drafted by the parties themselves without the assistance of legal counsel.

AdSTM.  The circuit court affirmed, ratified, and incorporated this agreement into the parties' final divorce decree entered on November 30, 2007.

Paragraph 5 of the PSA established Ran's spousal support obligation.  That provision stated, in pertinent part, that "[Ran] shall pay [Guan] a lump sum of $250,000 as spousal support, payable in five consecutive years with $50,000 per year, starting July 5th, 2008."  The provision also waived Ran's right to receive spousal support from Guan.  When addressing the spousal support obligation established in the PSA, the parties' final decree of divorce noted that "the support obligation as it becomes due and unpaid creates a judgment by operation of law."

Paragraph 8 of the PSA addressed the division of the parties' personal property.  Notably, subsection (d) of that paragraph addressed a prior $1,800,000 distribution made to Guan from AdSTM.  Paragraph 8(d), entitled "Distribution of Funds," stated:

> [Ran] deposited certain funds into [Guan's] bank account on November 3, 2006, and [Guan] acknowledges receipt of these funds.  These funds shall be [Guan's] sole and separate property.  As soon as AdSTM has enough funds after paying salaries, expenses, taxes, [and] health insurance, [Guan] or [Ran] shall deposit the same amount to [Ran] and this fund shall be [Ran's] sole and separate property.  To maintain AdSTM's operating funds, [Ran] agrees to take his amount in installments.

Paragraph 9 of the PSA addressed the parties' interests in AdSTM.  Among other things, Paragraph 9 established that Ran would purchase 510 shares of AdSTM from Guan on July 5, 2008, and thereby become the majority shareholder of the company.[3]  Paragraph 9 also stated that "[d]uring the period through July 5th, 2008, neither [Ran] nor [Guan] shall receive a higher income than the other from AdSTM, and the income of each party shall be not less than $150,000 per year."  Additionally, Paragraph 9 addressed the future managerial and financial roles of Guan and Ran in the ongoing operation of AdSTM.

---

[3] The testimony of the parties suggested that AdSTM was scheduled to "graduate" from the Small Business Administration's Section 8(a) program on July 5, 2008.

Paragraph 16 of the PSA addressed the settlement of any potential disputes arising under the agreement. In Paragraph 16, Guan and Ran agreed to try to resolve any future disputes involving the PSA without resorting to litigation. To that end, the parties agreed to attempt to initially resolve disputes through mediation. Paragraph 16, however, allowed either party to present a dispute arising under the PSA to a court of proper jurisdiction when mediation failed to resolve the dispute or did not "appear to be productive." Paragraph 16 then stated:

> If either party files a petition charging the other with a breach of any of the provisions of this agreement and the matter is heard by a court, the prevailing party shall have the right to have all of his or her reasonable legal fees and costs in the matter reimbursed by the party who does not prevail.

Paragraph 19 of the PSA addressed the ability of the parties to modify the agreement in the future. That provision stated, "No modification or waiver of any of the terms of this agreement shall be valid unless in writing and signed by both parties and notarized at [Guan's] bank." Paragraph 19 also established that "[t]he failure of either party to insist upon the strict performance of any provision of this agreement shall not be construed as a relinquishment of such right."

Shortly before Ran was scheduled to purchase the majority of the shares of AdSTM from Guan pursuant to the PSA, Guan withdrew approximately $2,400,000 from the company's accounts through a series of distributions.[4] Ran objected to the distributions, and disagreements arose concerning the parties' interests in AdSTM. The parties agreed to renegotiate their interests in the company in an effort to amicably resolve their dispute.

After several months of negotiation, the parties executed an amendment to their PSA on October 15, 2008. In the amendment, Ran agreed to allow Guan to keep the distributions she

---

[4] These distributions form the basis of Ran's assignment of error challenging the circuit court's holding concerning his right to a $2,462,083 offset distribution.

received from AdSTM in 2008 and Guan agreed to waive Ran's spousal support obligation. Specifically, Paragraph 2 of the amendment stated:

> [Guan] is entitled to all the [AdSTM] distributions made to her and the taxes AdSTM paid to IRS and VA State for [Guan] from 1/1/2008-7/1/2008, and those payments are [Guan's] sole property. [Ran] agrees that those payments were made correctly and [Ran] shall not claim any part of it. In addition [Ran] agrees that the wording of "income" in the original agreement citing: ". . . Neither [Ran] or [Guan] shall receive a higher income than the other from AdSTM . . ." means salary and bonus only. And the spousal support in the original agreement ([signed] on Dec. 15, 2006 between [Ran] and [Guan]) is voided. [Ran] shall not pay any spousal support to [Guan]. And [Guan] shall not claim any spousal support under any circumstances.

The terms set forth in Paragraph 2 were expressly made contingent on Ran's purchase of Guan's home pursuant to another section of the amendment.

Paragraph 3 of the amendment clarified each party's interest in AdSTM. That paragraph established that Guan owned 51% of AdSTM, and Ran owned the remaining 49% of the company. Other provisions of the amendment addressed the roles that each party would play in the future management of the business. Paragraph 7 of the amendment stated that "[Guan] and [Ran] shall have the same salary and bonus, other benefits and . . . profit distribution from AdSTM. Minimum salary [b]onus of Guan or/and [sic] Ran will be $150K."

In Paragraph 17 of the amendment, Guan and Ran agreed that the amendment was the only valid amendment to the parties' PSA. They also agreed to a punitive provision triggered by any potential breach of the terms of the amendment. Paragraph 17 stated, in pertinent part, "If this amendment is breached, then the original agreement [the PSA] will become the governing agreement."

Paragraph 19 of the amendment addressed disputes over the accuracy of corporate documents. That paragraph stated, "Both [Ran] and [Guan] have reviewed all corporate documents and files prior to 7/l/2008 and agree with all that is in those documents are correct

[sic]." That paragraph also stated that "[Ran] and [Guan] shall not threaten each other or take any legal action against each other."

The October 15, 2008 amendment resolved the parties' disputes for a period of almost seven years. During that period, neither party claimed that the other had breached the terms of either the amendment or their PSA. In fact, the parties got along both professionally and personally. In 2014, however, their affable relationship rapidly dissolved due to business disputes pertaining to the security clearance required by many of AdSTM's government contracts.

On October 10, 2014, Guan filed a petition requesting the circuit court to issue a rule to show cause commanding Ran to appear and explain why he should not be held in contempt of court for his noncompliance with the terms of the PSA incorporated into the parties' final decree of divorce. Guan alleged that Ran had violated the terms of the PSA by failing to pay her any spousal support. She also alleged that Ran had not properly paid her salary and distributions from AdSTM pursuant to the terms of the PSA. Additionally, Guan claimed that Ran had violated the PSA by failing to reimburse her for their children's college expenses. Guan requested the circuit court to order Ran to pay her the sums owed to her under the parties' PSA under pain of contempt, and award her the attorney's fees and costs associated with the enforcement of their agreement.[5]

On October 13, 2014, the circuit court issued a rule to show cause commanding Ran to appear and explain his failure to comply with the terms incorporated into the parties' final decree

---

[5] Guan's petition also requested the circuit court to enter an order freezing Ran's assets to preserve the status quo during the litigation. On October 15, 2014, Guan filed a separate motion for injunctive relief that requested the circuit court to enter an order freezing the assets of both Ran and AdSTM. The circuit court denied these requests at the conclusion of a hearing held on October 22, 2014.

of divorce. The parties then engaged in months of extensive discovery, with each party employing forensic accountants to analyze AdSTM's finances.

On May 1, 2015, Ran filed a motion to modify the parties' final decree of divorce based on the October 15, 2008 amendment to the PSA. Although Guan's petition failed to reference the amendment, Ran attached a copy of the amendment to his motion and requested the circuit court to modify the parties' divorce decree to conform to its terms. Guan opposed Ran's motion by arguing that the amendment contained void and ineffective provisions and that it was signed under duress.

Following three days of evidentiary hearings, the circuit court issued a letter opinion resolving most of the issues presented in this case.[6] As a preliminary matter, the circuit court held that the parties were bound by the terms of the October 15, 2008 amendment to their PSA. The circuit court emphasized that the amendment "was relied on by both parties from the time of its entry until this litigation."

The circuit court rejected Guan's claim to spousal support pursuant to the terms of the amendment. As Guan waived her right to receive spousal support in the amendment, the circuit court concluded that she was not entitled to receive the spousal support award outlined in the parties' PSA and incorporated into the divorce decree. The circuit court noted, however, that the initial $50,000 spousal support payment outlined in the PSA had already accrued when the parties agreed to the amendment. Therefore, the circuit court concluded that Guan was entitled to receive that payment.

The circuit court then applied the terms of the amendment to calculate the amounts of money owed to each party. The circuit court found the calculations provided by Ran's expert witness "more compelling" than those offered by Guan's expert witness, and applied those

---

[6] The circuit court struck Guan's claim regarding the reimbursement of the children's college expenses during the evidentiary hearings.

calculations with one exception. The circuit court disagreed with the manner in which Ran's expert witness addressed the distributions that Guan received from AdSTM in 2008 shortly before Ran was scheduled to become the majority owner of the business. Although Ran's expert classified the approximately $2,400,000 of distributions as Guan's income, the circuit court concluded that such a classification was contrary to the language of Paragraph 2 of the amendment. The circuit court explained that:

> A fair and sensible reading of the paragraph leads to the conclusion that the parties intended that the $2,492,000 Ms. Guan distributed to herself was to be her separate property not subject to equalizing payments to Mr. Ran. This conclusion is supported by the party's language to the effect that the payments were distributions correctly made and, perhaps more importantly, that for purposes of equalized income between the parties, income was to include only salaries and bonuses.

Thus, the circuit court refused to allow Ran to take an equalizing $2,400,000 setoff distribution from AdSTM, or to discount the amounts owed to Guan by that amount.

Although Guan had requested the circuit court to order Ran to pay her almost $4,000,000 pursuant to the terms of the parties' PSA, the circuit court concluded that Ran owed her $614,764 pursuant to the October 15, 2008 amendment. Citing the "imprecise and often confusing language employed by the parties in their various agreements," the circuit court withheld a ruling on the contempt of court issue and allowed Ran to avoid being held in contempt by paying Guan the sum owed within 180 days of the entry of a final order.[7]

On May 13, 2016, the circuit court held a hearing concerning the form of the final order and the award of attorney's fees and costs. The circuit court determined that it had miscalculated the amount of distributions received by Guan from AdSTM in 2008. The circuit court

---

[7] The circuit court also expressly rejected Guan's claim that she agreed to the amendment under duress. In general, the circuit court concluded that Guan's testimony was not credible. Although the circuit court noted that Ran had some "credibility issues," it concluded that Guan's testimony "was often simply not believable nor supported by objective evidence."

recalculated the amount of these distributions, and concluded that Guan had actually received $2,462,000 instead of $2,492,000.

The circuit court also clarified its holding regarding the breach of the terms of the amendment.[8] As the amendment expressly stated that "[Guan] shall not claim any spousal support under any circumstances" and that "[Ran] and [Guan] shall not . . . take any legal action against each other," the circuit court concluded that Guan had breached the amendment by filing her petition requesting the payment of spousal support.

The circuit court then addressed the effect of Guan's breach. Because the amendment provided that the PSA would become the "governing agreement" upon the breach of its terms by either party, the circuit court determined that the terms of the PSA, including those pertaining to the payments owed to Guan from AdSTM, became the controlling agreement on October 14, 2014, the date that Guan breached the amendment by filing her petition requesting spousal support.

Based on these holdings, the circuit court recalculated the payments owed to Guan under both the terms of the amendment and the PSA. Applying the terms of the amendment to the payments owed to Guan from the time of its execution until October 14, 2014, and the terms of the PSA to the payments owed to Guan after October 14, 2014, the circuit court concluded that Ran owed Guan $535,814.[9]

---

[8] While the circuit court's letter opinion stated that Ran had not breached the terms of the amendment, it was silent as to whether Guan had breached the amendment. In the letter opinion, however, the circuit court adopted the calculations of Ran's expert witness concerning the amount of payments due to Guan from AdSTM, and those calculations assumed that Guan breached the terms of the amendment when she filed her petition requesting the payment of spousal support in October of 2014.

[9] Although Guan argues that the circuit court erred by determining that she breached the amendment by requesting spousal support, neither party assigned error to the circuit court's decision concerning the effect of the breach.

The circuit court denied both parties' requests for attorney's fees and costs. While the circuit court recognized that the parties' PSA awarded attorney's fees and costs to the "prevailing party" in any legal action required to enforce the terms of the agreement, the circuit court noted that both parties prevailed on different issues presented in the case. The circuit court implicitly acknowledged that Ran prevailed on more of the issues presented than Guan, noting that Guan successfully recovered only "approximately twelve percent" of the payments she requested. Under the circumstances, however, the circuit court concluded that neither party prevailed in the litigation.

The circuit court entered a final order in this matter at the conclusion of the May 13, 2016 hearing. Among its provisions, the final order expressly incorporated the October 15, 2008 amendment into the parties' final decree of divorce pursuant to Code § 20-109(C). This appeal followed.

## II. ANALYSIS

Collectively, the parties challenge four of the circuit court's decisions on appeal: (1) the decision regarding spousal support, (2) the decision regarding Guan's breach of the terms of the amendment, (3) the decision regarding Ran's right to a setoff distribution of $2,400,000, and (4) the decision regarding attorney's fees and costs. In order to analyze the issues presented by the parties, we must construe the terms of their marital agreements. Specifically, we must analyze the terms of the parties' PSA and the October 15, 2008 amendment to that agreement.

As a marital agreement is a form of a contract, "[t]he construction of a marital agreement is subject to the rules of contract construction generally." Plunkett v. Plunkett, 271 Va. 162, 166, 624 S.E.2d 39, 41 (2006). Accordingly, we apply the same standard of review to the circuit court's decisions involving the interpretation of the parties' marital agreements that we would

- 11 -

apply to its interpretation of other types of contracts. See Craig v. Craig, 59 Va. App. 527, 537, 721 S.E.2d 24, 28 (2012).

Questions involving the interpretation of a contract present issues of law that we review *de novo*. Plunkett, 271 Va. at 166, 624 S.E.2d at 41. While we give deference to the circuit court's factual findings underlying its interpretation of the contracts at issue, "we are not bound by the [circuit] court's conclusions as to the construction of the disputed provisions." Craig, 59 Va. App. at 537, 721 S.E.2d at 28 (quoting Bergman v. Bergman, 25 Va. App. 204, 211-12, 487 S.E.2d 264, 268 (1997)). "[R]ather, we have an equal opportunity to consider the words of the contract within the four corners of the instrument itself." Eure v. Norfolk Shipbuilding & Drydock Corp., 263 Va. 624, 631, 561 S.E.2d 663, 667 (2002).

## A. THE OCTOBER 15, 2008 AMENDMENT DID NOT EFFECTIVELY WAIVE THE SPOUSAL SUPPORT AWARD

On appeal, Guan contends that the circuit court erred by concluding that she waived her right to receive spousal support in the October 15, 2008 amendment to the parties' PSA. Despite her express waiver of her right to receive spousal support, Guan argues that the amendment did not effectively terminate Ran's spousal support obligation. We agree with Guan's argument. Under the particular circumstances of this case, an agreement between the parties could have never effectively waived the lump sum spousal support obligation established by the parties' final decree of divorce.

We begin our analysis by acknowledging that the parties were permitted to modify their PSA pursuant to the terms of that agreement and by statute. Paragraph 19 of the PSA allowed the parties to modify or waive any term of the agreement in a written document "signed by both parties and notarized at [Guan's] bank." Code § 20-109(C) also allowed the parties to amend the PSA incorporated into their final decree of divorce. That statute states, in pertinent part, "If [a

- 12 -

marital agreement] is filed after entry of a final decree and if any party so moves, the court shall modify its decree to conform to such stipulation or contract."

Under either the modification provision of the parties' PSA or Code § 20-109(C), the parties were required to petition the circuit court for a modification of its final decree of divorce in order for any waiver of the spousal support award to be effective. Standing alone, an amendment could not effectively waive the spousal support award established by the parties' final decree of divorce.

Code § 20-109(C) explicitly requires a party to file a motion requesting the circuit court to modify its divorce decree to conform to the terms of a post-decree marital agreement. Furthermore, while the modification provision contained in the parties' PSA failed to expressly require the circuit court to approve any written amendment agreed upon by Guan and Ran, the parties could not waive a court-ordered spousal support award without obtaining judicial approval of the waiver. "No agreement of the parties has any effect on [a] decree awarding alimony unless it is ratified and made effective by judicial sanction." Higgins v. McFarland, 196 Va. 889, 895-96, 86 S.E.2d 168, 172 (1955); see also Capell v. Capell, 164 Va. 45, 52, 178 S.E. 894, 896 (1935); Richardson v. Moore, 217 Va. 422, 423, 229 S.E.2d 864, 866 (1976).

> In Virginia, the power of a trial court to award alimony is incidental, inherent and express. When appropriate jurisdiction exists over the parties and the subject matter, the court may enter such orders as are necessary and proper to protect the interest of [a spouse entitled to receive alimony], and its jurisdiction cannot be ousted by any agreement outside of the court, which the court itself does not adopt and approve.

Casilear v. Casilear, 168 Va. 46, 55, 190 S.E. 314, 318 (1937).

On May 1, 2015, Ran filed a motion requesting the circuit court to modify the parties' final decree of divorce to conform to the October 15, 2008 amendment. Pursuant to the modification provision of the parties' PSA and Code § 20-109(C), the circuit court had the

authority to modify the divorce decree to reflect the terms of the parties' post-decree agreement. The circuit court could not, however, retroactively modify the fully vested and accrued lump sum spousal support obligation at issue in this case.

The parties' PSA expressly stated that Ran owed Guan "a lump sum of $250,000 as spousal support, payable in five consecutive years with $50,000 per year, starting July 5th, 2008."

> [A] lump sum award is a fixed obligation to pay a sum certain when the decree is entered[,] but the amount may be payable either in deferred installments or at once. That the payment method may allow for deferred installment payments does not change the character of the award. Thus, *the right to the amount, whether payable immediately or in installments, is fixed and vested at the time of the final decree and the amount is unalterable by court order* . . . .

Mallery-Sayre v. Mallery, 6 Va. App. 471, 475, 370 S.E.2d 113, 115 (1988) (emphasis added); see also Code § 20-112 (stating that "no support order may be retroactively modified"); Cass v. Lassiter, 2 Va. App. 273, 280, 343 S.E.2d 470, 475 (1986) ("Support obligations ordered by the original decree of divorce become vested as they accrue and a court is without authority to make any change as to past due installments.").

The lump sum spousal support award at issue in this case became fully vested when the circuit court entered the final decree of divorce.[10] Therefore, the circuit court could not retroactively modify that obligation to conform to the parties' post-decree amendment to their PSA. While the circuit court had the authority to modify the terms of the final decree that did not pertain to the spousal support award pursuant to Code § 20-109(C), the circuit court did not

_____

[10] Alternatively, we note that each installment payment of the lump sum spousal support award accrued before Ran filed his motion requesting the circuit court to modify the parties' final decree of divorce to comply with the October 15, 2008 amendment. The installment payments were due each year, beginning in 2008 and ending in 2012. Ran did not file his motion for modification, however, until May 1, 2015, approximately three years after the last payment had accrued. See Code § 20-112 (a court may only modify spousal support "with respect to any period during which there is a pending petition for modification in any court").

- 14 -

have the authority to modify a vested lump sum spousal support award under that statute. See Radford v. Radford, 16 Va. App. 812, 813, 433 S.E.2d 35, 36 (1993) (Code § 20-109 "applies to periodic payments of spousal support, not to a lump sum award."). Therefore, the circuit court erred by modifying the final decree to waive the lump sum spousal support obligation set forth in the parties' PSA.

In summary, we conclude that the October 15, 2008 amendment to the parties' PSA did not effectively waive Ran's spousal support obligation. The court-ordered spousal support obligation at issue in this case could not be waived by a private agreement between the parties unless a court approved the agreement and modified the order that established the support award. As the spousal support award at issue was a fully vested lump sum award, the circuit court did not have the authority to alter the parties' final decree of divorce to retroactively modify Ran's spousal support obligation. Thus, the circuit court could not modify its final decree to conform to the terms of the amendment waiving Ran's spousal support obligation.

Accordingly, we hold that the circuit court erred by concluding that Guan waived her right to receive spousal support. Consequently, we conclude that she was entitled to receive the entire $250,000 spousal support award established by the parties' PSA and incorporated into their final decree of divorce.

### B. GUAN DID NOT BREACH THE TERMS OF THE OCTOBER 15, 2008 AMENDMENT BY ATTEMPTING TO COLLECT SPOUSAL SUPPORT

Guan also contends that the circuit court erred by concluding that she breached the terms of the October 15, 2008 amendment to the parties' PSA. The circuit court determined that Guan breached the terms of the October 15, 2008 amendment by taking legal action to enforce Ran's spousal support obligation. For the reasons that follow, we conclude that Guan did not breach the amendment.

The circuit court's decision regarding Guan's breach of the October 15, 2008 amendment was based on the express terms of that agreement. In Paragraph 2 of the amendment, Guan attempted to waive her right to receive the spousal support payments established by the parties' PSA and incorporated into their final decree of divorce. That paragraph explicitly endeavored to "void" Ran's spousal support obligation. It also stated that Guan "shall not claim any spousal support under any circumstances."

As previously noted, the amendment did not effectively waive Ran's spousal support obligation. The amendment could not modify the court-ordered spousal support obligation without judicial sanction, and the circuit court could not modify its final divorce decree to alter the vested lump sum spousal support award. Thus, Guan's waiver of her right to receive the spousal support payments at issue in Paragraph 2 of the October 15, 2008 amendment had no effect. Because Guan did not effectively waive her right to petition the circuit court to collect spousal support, she did not breach Paragraph 2 of the amendment.

Paragraph 19 of the amendment provided an alternate basis for the circuit court's decision concerning Guan's alleged breach. In pertinent part, that paragraph stated that "[Ran] and [Guan] shall not threaten each other or take any legal action against each other." Regardless of whether or not Guan was entitled to receive the spousal support payments set forth in the parties' PSA, Ran contends that Guan breached the amendment by taking legal action against him by petitioning the circuit court to order him to pay the spousal support at issue or be held in contempt of court.

We conclude that the circuit court erred by determining that Guan breached the "covenant not to sue" provision contained in Paragraph 19 for two reasons. First, the language of the amendment limited the scope of the provision. When read in context, the covenant not to sue only applied to certain disputes related to AdSTM. Second, enforcing the provision

contained in Paragraph 19 to penalize Guan for attempting to enforce her vested spousal support award would violate public policy.

An isolated reading of the covenant not to sue provision of Paragraph 19 suggests that Guan breached the terms of the amendment by taking legal action against Ran. Nevertheless, "contracts must be considered as a whole 'without giving emphasis to isolated terms.'" Plunkett, 271 Va. at 167, 624 S.E.2d at 42 (quoting TM Delmarva Power, L.L.C. v. NCP of Va., L.L.C., 263 Va. 116, 119, 557 S.E.2d 199, 200 (2002)). "In other words, 'the meaning of a contract is to be gathered from all its associated parts assembled as a unitary expression of the agreement of the parties.'" Stacy v. Stacy, 53 Va. App. 38, 48, 669 S.E.2d 348, 353 (2008) (*en banc*) (quoting Sully Station II Cmty. Ass'n v. Dye, 259 Va. 282, 284, 525 S.E.2d 555, 556 (2000)).

In the present case, the application of the covenant not to sue provision contained in Paragraph 19 was limited by the preceding language of that section of the amendment. Paragraph 19 of the amendment addressed disputes over the accuracy of corporate documents following a business dispute between the parties earlier in the year. In totality, Paragraph 19 stated, "Both [Ran] and [Guan] have reviewed all corporate documents and files prior to 7/l/2008 and agree with all that is in those documents are correct [sic]. [Ran] and [Guan] shall not threaten each other or take any legal action against each other." When Paragraph 19 is read as a whole, it implies that the covenant not to sue provision only applies to disputes concerning the contents of the corporate documents of the parties' business. The first sentence of Paragraph 19 qualified the covenant not to sue contained in the second sentence.

This interpretation of the provisions of Paragraph 19 is supported by the context in which the parties agreed to the amendment. "[T]he facts and circumstances surrounding the parties when they made the contract, and the purposes for which it was made, may be taken into consideration as an aid to the interpretation of the words used . . . ." Stroud v. Stroud, 49

Va. App. 359, 367, 641 S.E.2d 142, 146 (2007) (quoting Seaboard Air Line R.R. Co. v. Richmond-Petersburg Tpk. Auth., 202 Va. 1029, 1033, 121 S.E.2d 499, 503 (1961)). The parties agreed to the October 15, 2008 amendment after Guan unilaterally took approximately $2,400,000 in distributions from AdSTM shortly before Ran was scheduled to become the majority owner of the business. We can reasonably infer that the purpose of the amendment was to resolve the ongoing disputes between the parties concerning the operation of their business, including the dispute regarding Guan's right to receive the $2,400,000 at issue. In order to resolve the dispute concerning the distributions, the parties agreed that the corporate documents were accurate and that they would not take any legal action against each other *concerning those documents*. Interpreting the covenant not to sue contained in Paragraph 19 to apply to legal actions unrelated to the parties' business disputes would not further the underlying purpose of the amendment.

Enforcing the covenant not to sue contained in Paragraph 19 to prevent Guan from enforcing her right to receive spousal support would also contradict strong policy considerations. While

> parties to a contract may specify the events or pre-conditions that will trigger a party's right to recover for the other party's breach of their agreement[,] . . . we have remained "committed to the view that parties may contract as they choose so long as what they agree to is not forbidden by law or against public policy."

Ulloa v. QSP, Inc., 271 Va. 72, 79-80, 624 S.E.2d 43, 48 (2006) (quoting Coady v. Strategic Res., Inc., 258 Va. 12, 17, 515 S.E.2d 273, 275 (1999)). "[A] provision that violates public policy is void and has no legal effect." Uniwest Constr., Inc. v. Amtech Elevator Servs., Inc., 280 Va. 428, 440, 699 S.E.2d 223, 229 (2010).

As explained above, a private agreement between the parties cannot waive a court-ordered spousal support obligation without judicial approval.

> A decree for alimony is something more than an order for the payment of money. . . . A decree for alimony "is an order compelling [one spouse to support the other], and this is a public as well as a marital duty -- a moral as well as a legal obligation." Branch v. Branch, 144 Va. 244, [251,] 132 S.E. 303, 305 [(1926)]. . . . "[L]aws enacted from considerations of public concern, and to subserve the general welfare cannot be abrogated by mere private agreement." Walter v. Walter, 189 Ill. App. 345[, 349 (1914)].

Capell, 164 Va. at 49, 178 S.E. at 895. This general principle has been established in Virginia for over eighty years. See id.

Ran's construction of the covenant not to sue contained in Paragraph 19 essentially circumvents the legal precedent requiring judicial approval of private agreements modifying court-ordered spousal support. By penalizing Guan for attempting to collect her vested spousal support payments, the covenant not to sue would give indirect effect to an unenforceable spousal support waiver. While Guan did not effectively waive the spousal support award at issue, Ran's construction of the covenant not to sue would bar her from collecting her vested spousal support payments unless she was willing to endure the consequences of breaching the amendment. We refuse to interpret the covenant not to sue contained in Paragraph 19 in a manner that would allow Ran to avoid satisfying the court-ordered spousal support obligation established in the parties' final decree of divorce without obtaining the judicial approval of the waiver at issue required by both case law and statute.

In summary, we conclude that Guan did not breach the October 15, 2008 amendment to the parties' PSA by petitioning the circuit court to enforce Ran's spousal support obligation. As she did not effectively waive her right to receive the spousal support payments at issue, she did not breach the terms of the amendment by requesting to receive the payments. Although the amendment contained a provision generally prohibiting Guan from taking legal action against Ran, that provision only applied to disputes pertaining to the parties' business. Additionally,

applying the covenant not to sue to penalize Guan from collecting vested spousal support would circumvent binding precedent and violate public policy.

Accordingly, we conclude that the circuit court erred by determining that Guan breached the amendment when she filed her petition to collect spousal support and that her breach triggered the punitive provision contained in Paragraph 17 of the amendment. Therefore, we also conclude that the circuit court erred by determining that the parties' PSA became the governing agreement upon Guan's breach of the amendment and calculating the amounts of money owed to Guan pursuant to the terms of that agreement. On remand, we direct the circuit court to recalculate the amounts owed to Guan under the terms of the October 15, 2008 amendment as if she had not breached that agreement.

### C.  THE OCTOBER 15, 2008 AMENDMENT DID NOT ENTITLE RAN TO TAKE A $2,462,083 SETOFF DISTRIBUTION

On appeal, Ran contends that the terms of the October 15, 2008 amendment entitled him to a setoff distribution of $2,462,083. Ran claims that this setoff distribution was necessary to equalize the distributions that Guan received from AdSTM in 2008 shortly before he was scheduled to become the majority shareholder of the business. We disagree with Ran's argument and affirm the circuit court's decision regarding this issue. The terms of the amendment, the terms of the parties' PSA, and the actions of the parties following the execution of the amendment implied that Ran was not entitled to a setoff distribution based on the distributions Guan received from AdSTM in 2008.

Ran's argument is based on Paragraph 7 of the amendment. In pertinent part, that paragraph stated that "[Guan] and [Ran] shall have *the same salary and bonus, other benefits and . . . profit distribution from AdSTM.*" (Emphasis added). Ran contends that he and Guan were entitled to equal profit distributions pursuant to the plain language of Paragraph 7. Accordingly,

he argues that he was entitled to a setoff distribution equal to the distributions taken by Guan in 2008.

In response to Ran's argument, Guan claims that the distributions she received from AdSTM in 2008 were her separate property and that Ran was not entitled to an equalizing setoff distribution.[11] Guan refers to Paragraph 2 of the October 15, 2008 amendment to support her position. In pertinent part, Paragraph 2 of the amendment stated:

> [Guan] is entitled to all the [AdSTM] distributions made to her and the taxes AdSTM paid to IRS and VA State for [Guan] from 1/1/2008-7/1/2008, and those payments are [Guan's] sole property. [Ran] agrees that those payments were made correctly and [Ran] shall not claim any part of it. In addition [Ran] agrees that the wording of "income" in the original agreement citing: ". . . Neither [Ran] or [Guan] shall receive a higher income than the other from AdSTM . . ." means salary and bonus only.

The circuit court placed emphasis on the alternative definition of "income" provided in Paragraph 2. In concluding that Ran was not entitled to a setoff distribution based on the distributions made to Guan in 2008, the circuit court expressly noted that "for purposes of equalized income between the parties, income was to include only salaries and bonuses."

This issue presents a question of contract interpretation that we review *de novo*. See Plunkett, 271 Va. at 166, 624 S.E.2d at 41. In general, "[c]ontracts are construed as written, without adding terms that were not included by the parties. Where the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning." Id. at 167, 624 S.E.2d at 42 (citations omitted) (quoting TM Delmarva Power, 263 Va. at 119, 557 S.E.2d at 200). "The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties

---

[11] Ran agrees that the distributions that Guan received were her separate property, and he does not claim that she should have been required to repay any of the distributions at issue to AdSTM. Rather, Ran only contends that he was entitled to an equivalent setoff distribution based on the distributions Guan received in 2008.

intended what the written instrument plainly declares." Stacy, 53 Va. App. at 44, 669 S.E.2d at 351 (quoting Irwin v. Irwin, 47 Va. App. 287, 293, 623 S.E.2d 438, 441 (2005)).

> In giving effect to the intention of the parties "as expressed by them in the words they have used," Irwin, 47 Va. App. at 293, 623 S.E.2d at 441 (citation and internal quotation marks omitted), we are not to treat any word or clause in the [contract] "as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly," Dominion Sav. Bank, FSB v. Costello, 257 Va. 413, 417, 512 S.E.2d 564, 567 (1999).

Stacy, 53 Va. App. at 48, 669 S.E.2d at 352-53. "When two provisions of a contract seemingly conflict, if, without discarding either, they can be harmonized so as to effectuate the intention of the parties as expressed in the contract considered as a whole, this should be done." Plunkett, 271 Va. at 168, 669 S.E.2d at 42 (quoting Ames v. Am. Nat'l Bank of Portsmouth, 163 Va. 1, 39, 176 S.E. 204, 217 (1934)). As previously stated, "the meaning of a contract is to be gathered from all its associated parts assembled as a unitary expression of the agreement of the parties." Stacy, 53 Va. App. at 48, 669 S.E.2d at 353 (quoting Sully Station II, 259 Va. at 284, 525 S.E.2d at 556).

When viewed as a whole, the October 15, 2008 amendment implied that the parties did not intend for Ran to receive a setoff distribution based on the distributions that Guan received from AdSTM in 2008. While a cursory reading of the payment provision contained in Paragraph 7 may suggest that Ran and Guan were entitled to receive equal distributions from AdSTM, such an interpretation would render the alternative definition of "income" provided in Paragraph 2 of the amendment meaningless.

We agree with the circuit court's conclusion regarding the effect of the alternative definition of "income" provided in Paragraph 2 of the October 15, 2008 amendment. Paragraph 2 expressly modified the definition of "income" as that term was used in the parties' PSA by specifying that, "the wording of 'income' in the original agreement citing: '. . . Neither [Ran] or

- 22 -

[Guan] shall receive a higher income than the other from AdSTM . . .' *means salary and bonus only.*" (Emphasis added). Thus, Paragraph 2 modified the definition of "income" as applied in the PSA to exclude the distributions made to the parties by AdSTM.

If the parties intended for Ran to receive a setoff distribution equal to the distributions taken by Guan in 2008, then there would have been no need to include an alternative definition of "income" in the amendment. Paragraph 7 established that Guan and Ran were entitled to equal salaries, benefits, bonuses, and profit distributions from AdSTM. The parties' decision to include the alternative definition of "income" that excluded distributions, however, implied that they did not intend for Paragraph 7 to apply to the distributions addressed in Paragraph 2. Instead, the inclusion of the alternative definition demonstrated that the parties intended for the distributions addressed in Paragraph 2 to be governed by the terms of the PSA rather than the amendment.

Furthermore, we note that Paragraph 7 did not expressly state that it applied retroactively to the distributions taken by Guan before the parties agreed to the amendment. This omission is significant when viewed in context with the parties' PSA.[12] Paragraph 8 of the PSA addressed a similar situation involving a $1,800,000 payment that Guan received from Ran. Like Paragraph 2 of the October 15, 2008 amendment, subsection (d) of Paragraph 8 of the PSA provided that the payment at issue was Guan's "sole and separate property." Notably, however, that subsection also stated that, "As soon as AdSTM has enough funds after paying salaries, expenses, taxes, [and] health insurance, [Guan] or [Ran] shall deposit the same amount to [Ran] and this fund shall be [Ran's] sole and separate property." By including the language

---

[12] As the October 15, 2008 amendment amended the parties' PSA, both documents constitute parts of the same contract and must be construed together. "It is elementary that where several papers constitute one contract, they must be given effect as one document, and all speak as of the same date." Bott v. N Snellenburg & Co., 177 Va. 331, 338, 14 S.E.2d 372, 374 (1941) (citing Weinroth v. Mill End Clothing Co., 84 Pa. Super. 107 (1925)).

establishing Ran's right to receive an equal payment from AdSTM, Paragraph 8 of the PSA essentially provided that Ran was entitled to receive a setoff distribution.

Unlike Paragraph 8 of the PSA, Paragraph 2 of the amendment did not address Ran's right to receive a setoff distribution. While the parties had addressed a similar situation in the PSA, they chose to treat the distributions at issue in Paragraph 2 of the amendment differently. In light of the express setoff provision included in Paragraph 8 of the PSA to address a similar dispute, the failure of the parties to include an express provision establishing Ran's right to a setoff distribution in Paragraph 2 implied that they did not intend for Ran to receive one.

Additionally, we acknowledge that the parties' actions following the execution of the amendment implied that they did not intend for Ran to receive a setoff distribution based on the distributions that Guan received from AdSTM in 2008. "It is long established that '[w]hen the terms of an agreement are . . . uncertain, the interpretation placed thereon by the parties themselves is entitled to great weight and will be followed . . . .'" Stroud, 49 Va. App. at 368, 641 S.E.2d at 146 (footnote omitted) (quoting Dart Drug Corp. v. Nicholakos, 221 Va. 989, 995, 277 S.E.2d 155, 158 (1981)). Although Ran claims that he was entitled to a $2,462,083 setoff distribution pursuant to the October 15, 2008 amendment, he did not attempt to collect such a distribution for almost seven years.[13] These actions implied that Ran did not believe that he was entitled to a setoff distribution, and we assign "great weight" to his interpretation of the amendment.

Based on the alternative definition of "income" provided in Paragraph 2 of the October 15, 2008 amendment, the language of Paragraph 8 of the parties' PSA pertaining to setoff distributions, and Ran's actions after the execution of the amendment, we conclude that the

---

[13] On appeal, Ran maintains that AdSTM did not have enough funds to pay him the disputed setoff distribution. We note, however, that under the calculations that Ran presented to the circuit court, AdSTM distributed over $12,000,000 to the parties between 2008 and 2014. Additionally, we note that Ran did not attempt to collect his distribution in installments.

parties did not intend for Ran to receive a $2,462,083 setoff distribution based on the distributions that Guan received from AdSTM in 2008. Interpreting Paragraph 7 of the amendment to allow Ran to receive a setoff distribution would render the definition of "income" provided in Paragraph 2 meaningless, and ignore the method by which the parties attempted to resolve a similar dispute and Ran's actions following the amendment. Accordingly, we conclude that Ran was not entitled to a $2,462,083 setoff distribution and affirm the circuit court's decision concerning this issue.

## D. ATTORNEY'S FEES AND COSTS

On appeal, both parties claim that the circuit court erred by refusing to award them the attorney's fees and costs associated with the proceedings pursuant to the terms of their PSA. Each party also requests us to award the attorney's fees and costs associated with this appeal. In order to resolve this issue, we must interpret the relevant provisions of the parties' PSA. While we apply a *de novo* standard of review when interpreting the PSA, see Plunkett, 271 Va. at 166, 624 S.E.2d at 41, we acknowledge that generally "[a]n award of attorney's fees is within the sound discretion of the court, and will not be disturbed on appeal absent evidence of abuse [of that discretion]." Stroud, 49 Va. App. at 379, 641 S.E.2d at 152 (quoting Price v. Price, 4 Va. App. 224, 237, 355 S.E.2d 905, 912 (1987)).

Paragraph 16 of the PSA addressed the award of attorney's fees and costs associated with the enforcement of the agreement. In pertinent part, that provision stated:

> If either party files a petition charging the other with a breach of any of the provisions of this agreement and the matter is heard by a court, the prevailing party shall have the right to have all of his or her reasonable legal fees and costs in the matter reimbursed by the party who does not prevail.

Both parties contend that they were the prevailing party in the litigation, and therefore, that they were entitled to be reimbursed for the attorney's fees and costs that they incurred in this

matter.  Guan claims that she was the prevailing party because a judgment was entered on her behalf.  Ran claims that he was the prevailing party because he prevailed on a majority of the issues presented to the circuit court.[14]

The Supreme Court has defined the term "prevailing party" when used in a similar context as:  "[a] party in whose favor a judgment is rendered, regardless of the amount of damages awarded."  Sheets v. Castle, 263 Va. 407, 413, 559 S.E.2d 616, 620 (2002) (quoting Black's Law Dictionary 1145 (7th ed. 1999)).  The Supreme Court further explained that:

> "The 'prevailing party,' within the meaning of the general rule that such a party is entitled to costs, is the party in whose favor the decision or verdict in the case is or should be rendered and judgment entered, and in determining this question the general result should be considered, and inquiry made as to who has, in the view of the law, succeeded in the action."

Id. at 414, 559 S.E.2d at 620 (quoting Richmond v. Cty. of Henrico, 185 Va. 859, 869, 41 S.E.2d 35, 41 (1947)).

We note, however, that the Supreme Court has also explained that a "prevailing party" under a similar contractual provision "is not entitled to recover fees for work performed on unsuccessful claims."  West Square, L.L.C. v. Commc'n Techs., Inc., 274 Va. 425, 434, 649 S.E.2d 698, 702 (2007) (quoting Ulloa, 271 Va. at 82, 624 S.E.2d at 49).  A prevailing party requesting an award of attorney's fees and costs has the burden to establish "to a reasonable degree of specificity" the attorney's fees and costs associated with the claims on which he or she prevailed.  See id. at 435-36, 649 S.E.2d at 703-04; Ulloa, 271 Va. at 83, 624 S.E.2d at 50.

---

[14] Ran additionally claims that Guan was not entitled to receive attorney's fees and costs because she initiated the litigation without attempting to resolve the dispute through mediation. While the parties agreed in their PSA to attempt to resolve any disputes through mediation, the PSA allowed the parties to present their disputes to a court for resolution when mediation did not "appear to be productive."  The circuit court expressly decided "as a matter of fact that mediation between these two people would have been useless."  Upon our independent review of the record, we conclude that this factual finding was supported by the evidence presented in this case.

In light of our decisions concerning the spousal support and breach issues presented on appeal, we conclude that the circuit court's decision pertaining to the award of attorney's fees and costs must be revisited. Due to our decisions on appeal, Guan is now the prevailing party on additional issues presented in this case. Therefore, we remand this case to the circuit court for reconsideration of its decision regarding the award of attorney's fees and costs associated with the proceedings before it. See Stacy, 53 Va. App. at 49-50, 669 S.E.2d at 353 (remanding a case for reconsideration of a decision regarding attorney's fees under similar circumstances).

Nevertheless, we conclude that Guan was the prevailing party regarding the issues presented on appeal and award her appellate attorney's fees and costs pursuant to the terms of the PSA. Guan prevailed on the spousal support, breach, and distribution issues, and the circuit court's decision pertaining to attorney's fees and costs has been reversed and remanded. Accordingly, we also remand this case to the circuit court for a determination of the reasonable attorney's fees, costs, and expenses incurred by Guan in this appeal.

### III. CONCLUSION

In summary, we conclude that the circuit court erred by holding that Guan waived her right to receive spousal support. The October 15, 2008 amendment did not effectively waive Ran's spousal support obligation. Therefore, we hold that Guan was entitled to receive the entire $250,000 spousal support award established by the parties' PSA and incorporated into their final decree of divorce, and we reverse the circuit court's decision to the extent it holds otherwise.

We also conclude that Guan did not breach the terms of the October 15, 2008 amendment by petitioning the circuit court to request the enforcement of Ran's spousal support obligation. Guan did not effectively waive her right to receive spousal support, and the covenant not to sue provision contained in the October 15, 2008 amendment did not apply to disputes pertaining to the collection of spousal support. Accordingly, we reverse the circuit court's determination that

Guan breached the October 15, 2008 amendment, and remand this case for the redetermination of the amounts owed to Guan under the terms of the amendment.

Additionally, we conclude that the circuit court correctly determined that Ran was not entitled to receive a $2,462,083 setoff distribution pursuant to the October 15, 2008 amendment. Such an interpretation of that agreement would render other contract terms meaningless, and ignore the parties' own interpretation of the amendment. Thus, we affirm the circuit court's decision pertaining to this issue.

In light of our holdings on appeal, we remand this case for the circuit court to reconsider its decision regarding the award of attorney's fees and costs associated with the proceedings before it, and to determine the appropriate amount of appellate attorney's fees and costs to be awarded to Guan.

For these reasons, the circuit court's decision is affirmed in part, reversed in part, and this case is remanded for further proceedings.

Affirmed in part, reversed in part, and remanded.